IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 18–20–BU–DLC |
| Plaintiff, | |
| vs. | ORDER |
| ANTHONY COLE DANIELS, | |
| Defendant. | |

Before the Court is Defendant Anthony Cole Daniels's motion to suppress (Doc. 18). The Court held a hearing on the issues presented in the motion on October 15, 2018. The Court denies the motion.

## FACTUAL BACKGROUND

Daniels has been charged with 21 U.S.C. § 846, Conspiracy to Distribute Methamphetamine; 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, Possession with Intent to Distribute Methamphetamine; and 18 U.S.C. § 922(g)(1), Prohibited Person in Possession of a Firearm. The physical evidence that provides grounds for these charges was found and seized pursuant to a search of Daniels's residence on June 7, 2018.

1

In 2010, Daniels was convicted by the State of Montana of one count of criminal production or manufacture of dangerous drugs, in violation of Montana Code Annotated § 45-9-110, and one count of operating an unlawful clandestine laboratory, in violation of Montana Code Annotated § 45-9-132. Daniels was sentenced to two concurrent terms of twenty years imprisonment with ten years suspended. Daniels was also required by state law to register as a violent offender. *See* Mont. Code Ann. § 46-23-502(13)(a).

On April 25, 2013, Daniels was paroled from his Montana state sentence. Pursuant to his conditions of parole, Daniels agreed that "[u]pon reasonable suspicion, as ascertained by a Probation/Parole Officer, [his] person, vehicle, and/or residence may be searched at any time, day or night, . . . without a warrant by a Probation/Parole Officer . . . ." (Doc. 20-2 at 1.) He also agreed that that "[his] residence must be approved by a Probation/Parole Officer" and that he would "not change [his] place of residence without first obtaining written permission from Probation/Parole Officer." (Doc. 22-1 at 1.) Daniels was also subject to ongoing registration requirements due to his classification as a violent offender.

Prior to June 7, 2018, state probation and law enforcement officers became aware that Daniels was not living at his last-registered address. Detective Daniel

Hayden heard from a confidential informant that Daniels was residing at a specific non-reported residence, a trailer located on Bozeman Trail Road, with his wife, "Sue." The same informant told Hayden that Daniels was again involved in drug activity. Hayden verified that: 911 calls associated Daniels with Susan Guinn; Guinn lived on Bozeman Trail Road; and Daniels was a violent offender on parole.

On June 6, 2018, Hayden traveled to the Bozeman Trail residence, where he noted: two vehicles registered to Daniels parked at the residence; a male resembling Daniels working in the yard; and mail with Daniels's name in the mailbox. The same day, Montana Probation Officer John Madigan went to Daniels's last-registered address. He looked through the windows and saw that the residence was empty of furniture and other household items. Although a vehicle registered to Daniels was parked outside the residence, Madigan believed, due to the emptiness of the residence, that Daniels had moved out.

At 9:30 a.m. on June 7, 2018, Madigan, Hayden, and five other law enforcement officers arrived at the Bozeman Trail residence. Madigan knocked on the door to the trailer several times, announcing "Probation and Parole." Daniels opened the door, naked. Because he believed that Daniels posed a safety threat to the officers, Madigan walked with Daniels to a bedroom, where Daniels got dressed, instead of waiting outside for Daniels to return fully clothed. Madigan

asked Daniels if there were weapons in the residence, and Daniels told him that there were weapons in the spare bedroom next door. After officers handcuffed Daniels and his girlfriend Guinn, Daniels admitted that he had moved into Guinn's residence without Madigan's permission. He also admitted that he had failed to update the violent offender registry as required by law.

Officers proceeded to search the residence while Daniels and Guinn were transported to jail. They found over $40,000 in cash, approximately 1.5 pounds of methamphetamine, approximately 2 pounds of marijuana, 27 firearms, drug paraphernalia, and chemical precursers. While in custody, Daniels made self-incriminating statements over the telephone, which were recorded.

Daniels was indicted on August 29, 2018. Trial is scheduled for November 5, 2018.

## LEGAL STANDARD

Generally, a criminal defendant seeking to suppress evidence bears the burden of establishing a violation of his Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). However, because warrantless searches are presumed unreasonable, the government bears the burden of proving the existence of an exception to the general warrant requirement. *United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987). The appropriate standard is whether the government

4

has met its burden by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

## DISCUSSION

Courts "'examine the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." *Samson v. California*, 547 U.S. 843, 848 (2006) (alteration omitted) (quoting *United States v. Knights*, 534 U.S. 112, 118 (2001)). "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* (quoting *Knights*, 534 U.S. at 118–19). However, "before conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched." *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc), *overruled on other grounds by United States v. King*, 432 F.3d 1072 (9th Cir. 2012) (en banc).

Daniels argues that law enforcement officers should not have knocked on the door of the Bozeman Trail residence on the morning of June 7. He claims that the officers had no right to be at the residence at that time and that they conducted an

unconstitutional, warrantless search by knocking on the door and announcing themselves as "Probation and Parole."

Daniels does not dispute that the search was justified if the officers acted lawfully in escorting Daniels to the bedroom to get dressed, as Daniels clearly admitted that he was in violation of his parole conditions, including his admissions that he was living in the residence and that he was in possession of firearms physically located within the residence. Rather, Daniels argues that Madigan lacked reasonable suspicion that Daniels was out of compliance with his parole conditions, making it unreasonable for law enforcement officers to pay a visit to the Bozeman Trail residence. Even assuming—as Daniels does in his brief—that law enforcement officers could not lawfully knock on the door of the Bozeman Trail residence without a reasonable suspicion that Daniels was violating his parole conditions, the Court disagrees.

Following an evidentiary hearing on Daniels's motion, the Court concludes that law enforcement acted reasonably at all points leading to the search. Law enforcement officers believed—and were justified in believing under any standard—that Daniels had vacated his former residence and moved into the Bozeman Trail residence. Because Daniels was a violent offender and parolee

subject to registration requirements, Madigan had reasonable suspicion that Daniels was in violation of his parole conditions.

The Court must look to the "totality of the circumstances" to determine whether an officer has a "reasonable suspicion"—defined as a "particularized and objective basis"—"for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Prior to knocking on the door of the Bozeman Trail residence, Madigan knew, based on his own observations and investigation and on the information relayed to him by Hayden, that: (1) 911 calls associated Daniels with Guinn; (2) Guinn lived at the residence; (3) Daniels's mail was in the mailbox on June 6; (4) two of Daniels's vehicles were parked there on June 6; (5) a man resembling Daniels was working in the yard on June 6; and (6) Daniels's last residence was empty of furniture and household options.  The officers' investigation revealed information consistent with a report from a confidential informant that Daniels and Guinn were married and living together in the Bozeman Trail residence, and that informant also reported that Daniels was involved in illegal drug activity.  Under the totality of the circumstances, Madigan had a particularized and objective basis for his belief that Daniels was living in the Bozeman Trail residence, out of compliance with the terms of his parole.

At the suppression hearing, Daniels contended that the government effects a search whenever it "gain[s] visual access to the interior of a dwelling." *United States v. Winsor*, 846 F.2d 1569, 1572 (9th Cir. 1988) (en banc).  In *Winsor*, the Ninth Circuit held that a search for Fourth Amendment purposes was effectuated when law enforcement officers essentially went on a fishing expedition, commanding residents of a hotel room to open their doors until they found behind one of the doors a couple of bank robbers and their spoils.  *Id.*  As the Ninth Circuit later summarized, "*Winsor* supports the proposition that a Fourth Amendment search occurs when police command a person to reveal something in which he would otherwise have a reasonable expectation of privacy *and* that thing or that area is revealed as a result of the command."  *United States v. Pope*, 686 F.3d 1078, 1082 (9th Cir. 2012).

*Winsor* is distinguishable.  Here, unlike in *Winsor*, the defendant does not suggest that he "did not open his door voluntarily."  *Id.* at 1081 (citing *Winsor*, 846 F.2d at 1572).  The law enforcement officers on the scene at the Bozeman Trail residence did not abuse authority in order to gain access to the interior of the home.  Further, no incriminating evidence was found—aside from Daniels's physical presence in an unregistered residence—until after Daniels admitted to three distinct violations of the terms of his parole: (1) his move to an unregistered address; (2)

his failure to update the Montana violent offender registry; and (3) his possession of firearms.

Nor is this case analogous to *Florida v. Jardines*, 569 U.S. 1 (2013), the other case relied upon by Daniels at the suppression hearing. In *Jardines*, the United States Supreme Court held that a Fourth Amendment search occurs when law enforcement officers bring a trained narcotics dog into the curtilage of a home. *Id.* at 3–5, 11–12. Daniels appears to be arguing that Madigan and his fellow officers conducted a similar search by knocking on the door of the Bozeman Trail residence, as they did so as part of their investigation into Daniels's whereabouts. However, in *Jardines*, the Court made it clear that, just like "Girl Scouts and trick-or-treaters," "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* at 9 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). And this is true even when "[p]olice officers . . . announce their presence loudly and . . . knock on the door with some force." *King*, 563 U.S. at 468.

What is more, even if—as Daniels appears to suggest—Madigan was required to have probable cause to knock on the door on the morning of June 7, the Court finds the standard met. As discussed above, officers did not simply rely on an unverified tip from an informant but diligently investigated the circumstances

by examining law enforcement records and paying visits to Daniels's former residence, as well as the Bozeman Trail address. Looking to the totality of the circumstances, "a person of reasonable caution" would be justified in believing that Daniels was living at the Bozeman Trail residence in violation of his parole conditions. *Florida v. Harris*, 568 U.S. 237, 243 (2013) (alteration omitted) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion). Thus, even if a Fourth Amendment search occurred as Daniels opened the door, "law enforcement officers [had] probable cause to believe that the parolee [was] a resident of the house to be searched." *Motley*, 432 F.3d at 1080.

Under any test, then, the officers' conduct was justified in consideration of "the degree to which [the officers] intrude[d] upon [Daniels's] privacy" and the degree to which the officers needed to verify Daniels's residence "for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 118–19. Daniels was a parolee subject to registration requirements due to his history as a violent offender. Although they are not without protected privacy interests, parolees "do not enjoy 'the absolute liberty to which every citizen is entitled.'" *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). In this instance, law enforcement officers had a legitimate government interest in verifying the residence of a violent offender about whom

they had received reports of drug-related activity.  This interest warranted the officers' intrusion on Daniels's privacy interests when the officers knocked and announced themselves at the Bozeman Trail address.

IT IS ORDERED that the motion (Doc. 18) is DENIED.

DATED this 18th day of October, 2018.


Dana L. Christensen, Chief District Judge
United States District Court